UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3-20-09

SAMBA ENTERPRISES, LLC,                    :

      Plaintiff,      :      **AMENDED MEMORANDUM
                                                  DECISION**

   - against -           :      06 Civ. 8171 (DC)

ZANGO, INC. (f/k/a 180SOLUTIONS,    :
INC.),
                                    :
      Defendant.
                                    :
- - - - - - - - - - - - - - - - - -x

**APPEARANCES:**  ADVOCATE & LICHTENSTEIN, LLP
      By: Jason A. Advocate, Esq.
      780 Third Avenue, Fourth Floor
      New York, New York 10017
      Attorneys for Plaintiff

      SAVITT & BRUCE LLP
      By: Stephen C. Wiley, Esq.
      1325 Fourth Avenue, Suite 1410
      Seattle, Washington 98101
      - and -
      SMITH CAMPBELL LLP
      By: David S. Smith, Esq.
      110 Wall Street
      New York, New York 10005-3833
      Attorneys for Defendant

**CHIN, District Judge**

    Plaintiff Samba Enterprises, LLC ("Samba") commenced

this action against Zango, Inc. (f/k/a 180Solutions, Inc.)

("Zango") on October 5, 2006 to enforce a contract the parties

entered into on April 13, 2006 (the "Agreement"). Zango has

moved for partial summary judgment to resolve a dispute between

the parties as to the meaning of the term "net profits" in the

Agreement, and to dismiss Samba's claims for unjust enrichment

and quantum meruit. For the reasons set forth below, I conclude

that the term "net profits" has its plain and customary meaning, and that Samba's quasi-contract claims cannot be sustained where the parties have a valid and enforceable written contract.

## BACKGROUND

On April 13, 2006, Zango and Samba entered into the Agreement.  (Monlux Decl. ¶ 2; Id. Ex. 1 (Agreement)).  The Agreement set forth the terms of a referral fee to be paid by Zango to Samba for Samba's role in introducing Zango to iMesh, Inc. ("iMesh"), a company with which Zango had entered an agreement on March 30, 2006.  (Schmidt Decl. ¶¶ 3-7).[1]  Under the terms of the Agreement, Zango agreed to pay Samba as follows: "five percent (5%) of the net profits generated by the relationship with Imesh, as calculated and recorded by [Zango], for two (2) years from the effective date" of Zango's agreement with iMesh.  (Agreement § 3(a)).  The term "net profits" is not defined in the Agreement and was never discussed by the parties during negotiations.  (Schmidt Decl. ¶ 10).

## DISCUSSION

Zango argues that "net profits" under the Agreement should be given its standard meaning, as defined by a dictionary -- "[t]otal sales revenue less the cost of the goods sold and all additional expenses."  Black's Law Dictionary 1227 (7th ed. 1999); accord Merriam-Webster's Collegiate Dictionary 778 (10th

---

[1]     Samba's relationship with iMesh is the subject of a suit commenced by Samba in this Court.  See Samba Enter., LLC v. iMesh, Inc., No. 06 Civ. 7660 (DC) (S.D.N.Y. filed Sept. 22, 2006).

- 2 -

ed. 1993) ("remaining after the deduction of all charges, outlay, or loss"). Samba argues that the parties had a different, non-customary, definition of "net profits" in mind when they signed the Agreement -- namely, Zango's gross revenue minus the payments to iMesh. Samba concedes, however, that there were no discussions about the definition during negotiations, and that the Agreement does not explicitly reflect a non-customary definition of "net profits."

The Agreement contains a choice-of-law provision designating Washington as the governing law, Washington has a reasonable relationship to the Agreement because Zango is located in Washington, and neither party argues that any other state's law should apply. (Schedule A § 14). The Court will therefore apply Washington contracts law. See Motorola Credit Corp. v. Uzan, 388 F.3d 39, 51 (2d Cir. 2004) ("[W]here the parties have chosen the governing body of law, honoring their choice is necessary to ensure uniform interpretation and enforcement of that agreement and to avoid forum shopping."); Finucane v. Interior Constr. Corp., 264 A.D.2d 618, 620, 695 N.Y.S.2d 322, 324 (1st Dep't 1999) (holding that New York enforces choice-of-law provisions provided that "(a) the law of the State selected has a reasonable relationship to the agreement and (b) the law chosen does not violate a fundamental public policy of New York") (internal citations and quotations omitted).

Under Washington law, the "[i]nterpretation of an unambiguous contract is a question of law" that can be resolved

- 3 -

on a motion for summary judgment.  See Mayer v. Pierce County
Med. Bureau, 80 Wn. App. 416, 420-21, 909 P.2d 1323, 1326 (Wash.
Ct. App. 1995).  A contract is not ambiguous merely because the
parties disagree as to the meaning of a term, and the mere fact
that a term is undefined in a contract does not make it
ambiguous.  See N. Pac. Ins. Co. v. Christensen, 143 Wn. 2d 43,
53, 17 P.3d 596, 601 (Wash. 2001); State v. Morley, 134 Wn. 2d
588, 599, 952 P.2d 167, 172 (Wash. 1998); Cummings v. Edgate.Com,
Inc., No. 30423-6-II, 2004 Wash. App. LEXIS 645, at *8 (Wash. Ct.
App. Apr. 14, 2004).

        Extrinsic evidence can be considered to explain the
meaning of contractual terms, but not to change what is written
in the contract.  See Hearst Commc'ns, Inc. v. Seattle Times, 154
Wn. 2d 493, 503, 115 P.3d 262, 267 (Wash. 2005) ("[W]e have
explained that surrounding circumstances and other extrinsic
evidence are to be used to determine the meaning of specific
words and terms used and not to show an intention independent of
the instrument or to vary, contradict or modify the written
word") (internal citations and quotations omitted).

        Here, the term "net profits" is simply not ambiguous,
despite Samba's efforts to make it so.  Samba does not even
present an argument as to how the term is ambiguous, but merely
asserts it is.  The only evidence Samba cites in support of its
assertion that the term is ambiguous is Schmidt's subjective
understanding that "net profits" meant gross revenue minus
payments to iMesh.  When interpreting a contract, however, "the

- 4 -

subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used." Hearst Commc'ns, Inc., 154 Wn. 2d at 504, 115 P.3d at 267.

Here, there is no evidence to suggest that the parties agreed that "net profits" would mean anything other than the standard meaning, and, indeed, Schmidt even admits that the parties never discussed what the term "net profits" meant during negotiations. (Schmidt Decl. ¶ 10). If Schmidt intended for "net profits" to mean something it does not ordinarily mean, he should have put that in the Agreement. But he did not, and he is therefore bound by the Agreement he freely signed. Cf. Tjart v. Smith Barney, Inc., 107 Wn. App. 885, 896-97, 28 P.3d 823, 829 (Wash. Ct. App. 2001).

The extrinsic evidence Samba seeks to admit consists primarily of internal Zango deliberations to which Samba ascribes some nefarious purpose. But the true purpose of the deliberations is clear: The Agreement requires Zango to "calculate[] and record[]" the "net profits generated by the relationship with Imesh." (Agreement § 3(a)). It is perfectly appropriate, then, for Zango to have email exchanges discussing how to calculate and record Zango's net profits from the contract with iMesh. In any event, because the term "net profits" is not ambiguous, the Court will not admit extrinsic evidence intended to give the term "net profits" anything other than its ordinary meaning.

Accordingly, as the term "net profits" is not defined in the contract, it will be given its "plain, ordinary, and popular meaning[]." Smith v. Cont'l Cas. Co., 128 Wn. 2d 73, 78-79, 904 P.2d 749, 751 (Wash. 1995); Panorama Vill. Condo. Owners Ass'n Bd. of Dirs. v. Allstate Ins. Co., 144 Wn. 2d 130, 140, 26 P.3d 910, 915 (Wash. 2001) (holding that where a term is not defined in a contract, "courts must interpret the plain meaning of the term as it would be understood by the average [person], rather than in a technical sense.") (internal citations and quotations omitted). "Plain" and "ordinary" means as defined by a dictionary. Bellevue Sch. Dist. v. Bentley, 38 Wn. App. 152, 158, 684 P.2d 793, 797 (Wash. Ct. App. 1984). Black's Law Dictionary defines "net profits" as the "[t]otal sales revenue less the cost of the goods sold and all additional expenses." 1227 (7th ed. 1999). Merriam-Webster's Collegiate Dictionary defines it as "remaining after the deduction of all charges, outlay, or loss." 778 (10th ed. 1993). These definitions shall govern the Agreement.

Defendant's motion to dismiss the claims for quantum meruit and unjust enrichment is granted. Under Washington law, a party may not assert claims for quantum meruit or unjust enrichment where the subject matter of those claims is covered by a valid and enforceable written contract. See Douglas Nw. v. Bill O'Brien & Sons Constr., 64 Wn. App. 661, 683, 828 P.2d 565, 578 (Wash. Ct. App. 1992); Macdonald v. Hayner, 43 Wn. App. 81, 85-86, 715 P.2d 519, 522-23 (Wash. Ct. App. 1986); Wash. Ass'n of

Child Care Agencies v. Thompson, 34 Wn. App. 235, 251, 660 P.2d 1129, 1138 (Wash. Ct. App. 1983).  There is no dispute that Zango and Samba have a valid and enforceable written contract. Accordingly, Samba's claims for quantum meruit and unjust enrichment are dismissed.

## CONCLUSION

For the foregoing reasons, defendant's motion for partial summary judgment is granted.[2]  The parties shall appear for a pretrial conference on April 8, 2009 at 10:00 a.m. in Courtroom 11A.

SO ORDERED.

Dated:     New York, New York
           March 20, 2009

                                    DENNY CHIN
                                    United States District Judge

---

[2]     The prior version of this memorandum decision, dated March 19, 2009, is hereby withdrawn.